IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STONEGATE INSURANCE COMPANY, *Plaintiff*, v. FLETCHER REINSURANCE COMPANY, f/k/a MAIDEN REINSURANCE NORTH AMERICA, INC., a Missouri corporation, ENSTAR (US) INC., a Delaware corporation, and CRANMORE (US) INC., a Delaware corporation, *Defendants*. | No. 21 CV 3523 Judge Virginia M. Kendall |

## MEMORANDUM OPINION AND ORDER

Plaintiff Stonegate Insurance Company ("Stonegate") brings this tort and breach of contract action against Defendants Fletcher Reinsurance Company, f/k/a/ Maiden Reinsurance North America, Inc. ("Fletcher"), Enstar (US) Inc. ("Enstar"), and Cranmore (US) Inc. ("Cranmore"). (*See* Dkt. 1-2 at 8–26). The Complaint alleges various claims in connection with reinsurance agreements between Stonegate and Fletcher, whereby Fletcher reinsured Stonegate's automobile and commercial insurance lines from 2012 through 2017. (*Id.* at 11–12). Specifically, Stonegate brings claims for: Breach of Contract as to Fletcher (Count I); Tortious Interference with Contract as to Enstar and Cranmore (Count II); and Bad Faith Refusal to Pay Claims Under 215 ILCS 5/155 as to all Defendants (Count III). (*Id.* at 20–25). Now before the Court are two motions: Fletcher's Motion to Compel Arbitration and Dismiss All Claims, (Dkt. 13), and Enstar and Cranmore's Motion to Dismiss, (Dkt. 9). For the reasons set forth below, the Defendants' motions [9, 13] are granted.

1

## BACKGROUND

On a motion to dismiss under Rule 12(b)(6), the Court accepts the complaint's well-pleaded factual allegations, with all reasonable inferences drawn in the non-moving party's favor, but not its legal conclusions. *See Smoke Shop, LLC v. United States*, 761 F.3d 779, 785 (7th Cir. 2014). The following factual allegations are taken from Stonegate's Complaint, (Dkt. 1-2 at 7–26), and are assumed true for purposes of this motion. *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016).

Stonegate filed a Complaint against Defendants on May 25, 2021 in the Circuit Court of Cook County, Illinois, Law Division, in an action bearing Case No. 2021-L-005384. (Dkt. 1 at 1). On July 1, 2021, Defendants removed the case to this Court on the basis of diversity jurisdiction pursuant to 28 U.S.C. §§ 1332 and 1441. (Dkt. 29 at 2 (further noting that removal was unopposed)). Stonegate is an insurance company authorized to issue policies of insurance in Illinois, including, but not limited to, commercial automobile, business liability, liquor liability, general liability, and private passenger automobile policies. (Dkt. 1-2 at 10 ¶ 2). Defendants Fletcher, Enstar, and Cranmore are separate corporations that are subsidiaries of Enstar Group Limited. (*Id.* at 10–11 ¶¶ 3–6; *see also id.* at 9 (noting that the Complaint refers to each of the three Defendants together as "Enstar")). Stonegate entered into a series of Multiple Line Excess of Loss Reinsurance Agreements ("Reinsurance Agreements") with its reinsurer, Fletcher, from 2012 through 2017. (*Id.* at 11–12 ¶ 10; *see also id.* at 27 (Reinsurance Agreement dated January 1, 2012), 69 (Reinsurance Agreement dated January 1, 2014)). In turn, Enstar and Cranmore entered into agreements with Fletcher to service its reinsurance treaties, including the Stonegate Reinsurance Agreements. (*Id.* at 10–11 ¶¶ 4–5, 7).

This suit concerns Fletcher's alleged non-performance of its contractual obligations to Stonegate. In particular, Stonegate brought claims against Fletcher alleging non-payment of balances under the Reinsurance Agreements. (*E.g.*, *id.* at 21 ¶ 45 ("[Fletcher has not paid Stonegate its portion of losses and loss adjustment expenses on [a number of] claims."), 13 ¶ 14 ("Many invoices presently remain outstanding and unpaid; those outstanding invoices were submitted to [Fletcher] on average almost six months prior to the filing of this Complaint."); *id.* at 14, 16 ¶¶ 18, 29–30 (alleging that Fletcher wrongfully denied the "Clay Claim," which entailed an approximately $1 million settlement paid by Stonegate)).

Stonegate further alleges that Defendants Enstar and Cranmore wrongfully induced Fletcher to breach its contractual obligations to Stonegate in bad faith. (*Id.* at 11 ¶ 8, 20 ¶ 41, 22 ¶ 53, 24 ¶ 62). When Enstar acquired Fletcher in 2019, Stonegate's relationship with Fletcher became "adversarial, and at times combative, as delayed payments by [Fletcher] became the norm, Defendants fabricated coverage disputes, and Defendants made unreasonable demands for claim-related information." (*Id.* at 12–13 ¶ 13; *contra id.* at 12 ¶ 12 ("From 2011 until Enstar's acquisition of Maiden Re in late December 2018, Stonegate and Maiden Re operated harmoniously under a mutual understanding of the risk-sharing obligations imposed by the Treaties.")). Stonegate alleges that the Defendants are withholding payments "with such frequency and duration" in an attempt to strong-arm Stonegate into settling its valid claims "in bulk at a discount." (*Id.* at 13 ¶ 15). Moreover, Anthony D'Angelis – former Senior Vice President of Cranmore, and current US Head of Claims for Enstar Group – has directed Fletcher to "deny and delay payment on valid claims in accordance with Enstar's bad-faith business model, thus causing [Fletcher] to breach its obligations to Stonegate under the [Reinsurance Agreements]." (*Id.* at 13 ¶ 16).

3

**LEGAL STANDARD**

When considering a motion to dismiss under Rule 12(b)(6), the Court must "accept as true all factual allegations in the amended complaint and draw all permissible inferences in [the plaintiff]'s favor." *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 639 (7th Cir. 2015). To state a claim upon which relief may be granted, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Detailed factual allegations are not required, but the plaintiff must allege facts that when "accepted as true . . . 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' " *Iqbal*, 556 U.S. at 678. In analyzing whether a complaint meets this standard, the "reviewing court [must] draw on its judicial experience and common sense." *Id.* at 679. When there are well-pleaded factual allegations, the Court assumes their veracity and then determines whether they plausibly give rise to an entitlement to relief. *Id.*

**DISCUSSION**

**I. Fletcher's Motion to Dismiss**

Fletcher filed a Motion to Compel Arbitration and Dismiss All Claims. (Dkt. 13). Stonegate did not oppose arbitration of its claims against Fletcher; accordingly, the parties report that they are proceeding to arbitration. (Dkt. 29 at 2). However, they dispute whether Stonegate's claims as to Fletcher should be dismissed pending arbitration, as opposed to being stayed. The parties filed supplemental briefing on this issue. (*See* Dkts. 32–33).

The FAA provides that once the Court determines that arbitration should be compelled, the Court "shall on application of one of the parties stay the trial of the action until such arbitration

has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration." 9 U.S.C. § 3. Fletcher argues that notwithstanding the language of § 3, the Court should dismiss Stonegate's complaint because all claims asserted therein are subject to arbitration. (Dkt. 32 at 4). Fletcher asserts that courts routinely dismiss, rather than stay, lawsuits in such circumstances. (*Id.* at 4–5). Stonegate counters that a stay is the appropriate action to take on its Complaint – citing the statutory language, certain Seventh Circuit law, and judicial economy. (Dkt. 33 at 4–7).

The Seventh Circuit has instructed that, generally, "the proper course of action when a party seeks to invoke an arbitration clause is to stay the proceedings rather than to dismiss outright." *Halim v. Great Gatsby's Auction Gallery, Inc.*, 516 F.3d 557, 561 (7th Cir. 2008). However, several circuits have found that there is "a judicially-created exception to [this] general rule which indicates district courts may, in their discretion dismiss an action rather than stay it where it is clear the entire controversy between the parties will be resolved by arbitration." *Green v. SuperShuttle Int'l, Inc.*, 653 F.3d 766, 769–70 (8th Cir. 2011); *see also Soto-Fonalledas v. Ritz-Carlton San Juan Hotel Spa & Casino*, 640 F.3d 471, 473 (1st Cir. 2011); *Ozormoor v. T-Mobile USA, Inc.*, 354 F. App'x 972, 975 (6th Cir. 2009); *Poteat v. Rich Prods. Corp.*, 91 F. App'x 832, 835 (4th Cir. 2004); *Fedmet Corp. v. M/V BUYALYK*, 194 F.3d 674, 678 (5th Cir. 1999). While the Seventh Circuit has not expressly approved this approach, a number of courts within this district have embraced this judicially-created exception. *See, e.g.*, *Williams v. Planet Fitness, Inc.*, No. 20-cv-3335, 2021 WL 1165101, at *5–6 (N.D. Ill. Mar. 26, 2021); *Hauptman v. Midland Credit Mgmt., Inc.*, No. 1:18-cv-976, 2019 WL 8436961, at *2 (N.D. Ill. Jan. 31, 2019); *Taylor v. Samsung Elecs. Am.*, No. 16-cv-50313, 2018 WL 3921145, at *7 (N.D. Ill. Aug. 16, 2018); *Hudgins v. Total Quality Logistics*, LLC, No. 16-cv-7331, 2017 WL 514191, at *3 (N.D. Ill. Feb.

5

8, 2017); *HTG Cap. Partners, LLC v. Doe*, No. 15-cv-02129, 2016 WL 612861, at *8 (N.D. Ill. Feb. 16, 2016); *Soucy v. Cap. Mgmt. Servs., L.P.*, No. 14-cv-5935, 2015 WL 404632, at *6 (N.D. Ill. Jan. 29, 2015); *Bryant v. Fulgham*, No. 12-cv-823, 2012 WL 1802150, at *3 (N.D. Ill. May 17, 2012); *Denari v. Rist*, No. 10-cv-2704, 2011 WL 332543, at *11 (N.D. Ill. Mar. 24, 2011); *Dalope v. United Health Care of Ill.*, No. 03-cv-8918, 2004 WL 2325688, at *2 (N.D. Ill. Oct. 8, 2004); *Reineke v. Cir. City Stores, Inc.*, No. 03-cv-3146, 2004 WL 442639, at *5 (N.D. Ill. Mar. 9, 2004). Furthermore, the Seventh Circuit has repeatedly affirmed district courts' decisions to dismiss suits where all claims are arbitrable. *See, e.g.*, *Wallace v. Grubhub Holdings Inc.*, No. 18-cv-4538, 2019 WL 1399986, at *6 (N.D. Ill. Mar. 28, 2019), *aff'd*, 970 F.3d 798 (7th. Cir. 2020); *Johnson v. Orkin, LLC*, 928 F. Supp. 2d 989, 1008–10 (N.D. Ill. 2013), *aff'd*, 556 Fed. App'x 543 (7th Cir. 2014); *Baumann v. Finish Line, Inc.*, No. 1:08-cv-1385-LJM-JMS, 2009 WL 2750094, at *3 (S.D. Ind. Aug. 26, 2009), *aff'd*, 421 Fed. App'x 632 (7th Cir. 2011); *Am. Int'l Specialty Lines Ins. Co. v. Elec. Data Sys. Corp.*, 347 F.3d 665 (7th Cir. 2003).

Here, Stonegate's claims for relief arise out of Fletcher's alleged failure to perform under the Reinsurance Agreements. (Dkt. 14 at 6). The relevant arbitration provisions broadly cover "any dispute arising out of this Agreement." (Dkt. 1-2 at 51 (setting forth January 1, 2012 Reinsurance Agreement's arbitration clause), 96 (same with respect to January 1, 2014 Reinsurance Agreement)). Stonegate concedes that its claims are within the scope of the arbitration provisions. (Dkt. 33 at 2 ("Stonegate chose not to oppose arbitration of its claims against Fletcher, and Stonegate and Fletcher are therefore proceeding to arbitration of Stonegate's claims against Fletcher.")). Because the arbitration agreements are sufficiently broad to cover all of Stonegate's claims, retaining jurisdiction and staying this action would only serve to waste judicial resources. *See, e.g.*, *HTG Cap. Partners*, 2016 WL 612861, at *8 ("Dismissing rather than

6

staying is sensible because there is 'nothing for the court to decide unless and until a party seeks confirmation of or challenges the arbitrators' award.' ") (quoting *Bryant*, 2012 WL 1802150, at *3); *Soucy*, 2015 WL 404632, at *6 ("[W]hen all of the claims are subject to a valid and enforceable arbitration agreement, retaining jurisdiction and staying the case serves little purpose and is a waste of judicial resources.") (citing *Johnson*, 928 F. Supp. 2d at 1009). As such, dismissal is appropriate in this case. Fletcher's motion to dismiss [13] is granted.

## II. Enstar and Cranmore's Motion to Dismiss

Defendants Enstar and Cranmore (or "Defendants") move to dismiss the Complaint, arguing that (1) the Court lacks personal jurisdiction over them and (2) the Complaint fails to state claims upon which relief can be granted. Each argument is addressed in turn.

### A. Personal Jurisdiction

Specific jurisdiction "depends on an 'affiliatio[n] between the forum and the underlying controversy,' principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011); *see also, e.g.*, *Levy v. Chubb Corp.*, No. 00-cv-5698, 2001 WL 204793, at *2 (N.D. Ill. Feb. 28, 2001) ("Specific jurisdiction refers to jurisdiction over a defendant in a suit 'arising out of or related to the defendant's contacts with the forum.' "). There are three "essential requirements" for the exercise of specific jurisdiction over an out-of-state defendant: (1) the defendant's contacts with the forum must show that it "purposefully availed [itself] of the privilege of conducting business in the forum state or purposefully directed [its] activities at the state;" (2) the plaintiff's alleged injury must have arisen out of the defendant's forum-related activities; and (3) any exercise of personal jurisdiction must comport with traditional notions of fair play and substantial justice. *Curry v. Revolution Labs., LLC*, 949 F.3d 385, 398 (7th Cir.

2020). The essential point of the personal jurisdiction inquiry is to "ensure that an out-of-state defendant is not bound to appear to account for merely 'random, fortuitous, or attenuated contacts' with the forum state." *Id.*

Defendants set forth several arguments as to why the Court cannot exercise specific personal jurisdiction in this case. As to the first element of the relevant inquiry per *Curry*, Defendants assert that they have neither purposefully availed themselves of the privilege of conducting business in Illinois nor directed their activities at Illinois. (Dkt. 10 at 7). To that end, Defendants highlight that "*Fletcher* is the party that entered into contracts with Stonegate – not Enstar or Cranmore, who only entered into service agreements with Fletcher that cover an entire portfolio of reinsurance treaties as opposed to singular contracts." (*Id.* (emphasis in original); *see also* Dkt. 28 at 3 (because "[t]he service agreements permit [Defendants] to administer an *entire* portfolio of reinsurance treaties issued by Fletcher to *a diverse array* of reinsureds located in the U.S.," there is "no specific direction [of activities] toward Illinois.") (emphasis added)). As such, they caution the Court not to infer a specific direction of activity to Illinois "based on a series of transitive logical leaps." (*Id.*).

However, no logical leap is necessary to conclude that Defendants' alleged activity can be characterized as purposely directed at Illinois. The Seventh Circuit's decision in *Illinois v. Hemi Grp. LLC*, 622 F.3d 754 (7th Cir. 2010) is particularly instructive on this point. In *Hemi*, the defendant's contacts with Illinois were sufficient to establish specific personal jurisdiction. *Id.* at 757. This was because the defendant "stood ready and willing to do business with Illinois residents" and in fact "*knowingly did do business with Illinois residents*." *Id.* at 758 (emphasis added). As such, defendant's "argument that it did not purposefully avail itself of doing business in Illinois [rang] particularly hollow." *Id.* at 758 (emphasis added). *See also Felland v. Clifton*,

682 F.3d 665, 674–75 (7th Cir. 2012) (explaining that to determine whether conduct was "purposefully directed" at a forum state, courts inquire whether a defendant engaged in "intentional and allegedly tortious conduct" expressly aimed at the forum state, with knowledge that the plaintiff would be injured in that state).

Here, it is true that Stonegate entered reinsurance agreements directly with Fletcher rather than Defendants. Defendants nonetheless knowingly conducted business with Stonegate. For example, Enstar conducted audits of Stonegate's financials and files. (Dkt. 1-2 at 18, ¶ 34 ("D'Angelis (then the Senior Vice President of [Cranmore]), sent an email dated August 28, 2019 to Stonegate attaching a spreadsheet outlining 'various claim questions and document requests arising out of' the August 2019 audit.")). Enstar also entertained Stonegate's demands for payments under the relevant contracts, and at least sometimes satisfied those demands. (*Id.* at 21, ¶ 46). These actions established contacts with Illinois and can fairly be described as purposeful. Moreover, though Defendants may not have specifically sought out a direct business relationship with Stonegate in the same manner as Fletcher, they nonetheless entered into agreements with Fletcher to service its reinsurance treaties. (*Id.* at 11, ¶ 7; *see also id.* ¶ 8 ("Enstar agreed to service Stonegate's treaties with [Fletcher].")). These agreements included Stonegate's treaties with Fletcher. (*Id.* ¶¶ 7–8). As such, Defendants could have reasonably foreseen that they would be called upon to provide their services or conduct business in Illinois. *See Curry*, 949 F.3d at 399 ("There is no per se requirement that the defendant especially target the forum in its business activity; it is sufficient that the defendant reasonably could foresee that its product would be sold in the forum." (citing *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 781 (1984))).

Defendants argue that even if they "communicated with [Stonegate,] an Illinois based reinsured[,] and audited files in Illinois . . . these unremarkable contacts are insufficient to premise

9

personal jurisdiction." (Dkt. 28 at 3 (internal citation omitted)). Of course, however, Defendants' contact with Stonegate did not end there. For example, Defendants are also alleged to have played a direct role in denying Stonegate's Clay Claim. (*E.g.*, Dkt. 1-2 at 13 ¶ 16 ("Anthony D'Angelis . . . has on Enstar's behalf interfered with Maiden Re's and Stonegate's Treaties by directing Maiden Re to deny and delay payment on valid claims."), ¶ 27 ("In response to Stonegate's March 24, 2020 communication regarding the Clay Claim, D'Angelis (by email dated March 29, 2020) raised a late-notice coverage defense under Article 13 of the 2014 Treaty.")). Defendants further attempt to evade this Court's exercise of personal jurisdiction on the basis that "[t]here have been no allegations . . . that [Defendants physically] entered Illinois to negotiate the Reinsurance Agreements." (Dkt. 28 at 4; *see also* Dkt. 10 at 8 ("[N]one of the alleged activities occurred in Illinois.")). This argument fails for the same reasons set forth above, as well as because "[o]ur cases make clear . . . that physical presence is not necessary for a defendant to have sufficient minimum contacts with a forum state." *Curry*, 949 F.3d at 398.

Defendants next argue that it would offend notions of justice and fair play to allow Stonegate's case to proceed before this Court. (Dkt. 10 at 8). Defendants claim that "Illinois has no interest in adjudicating this dispute," and that they should not be forced to litigate in Illinois "simply because Fletcher, for whom they administer reinsurance treaties, agreed to reinsure an Illinois based company." (*Id.*). The Court considers the following factors in making this determination: "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." *Burger King v. Rudzewicz*, 471 U.S. 462, 477 (1985) (internal quotation marks omitted). A party's concern that a forum is

particularly unfair or inconvenient "usually may be accommodated through means short of finding jurisdiction unconstitutional." *Id.*

Applying the *Burger King* factors, the Court sees no unfairness in permitting this suit to proceed against Defendants in Illinois. Stonegate has a strong interest in providing a forum for its residents to seek redress for torts inflicted by out-of-state actors and injuries suffered within the state. *Felland*, 682 F.3d at 677. Further, as explained above, Defendants are not being hailed to this Court merely because *Fletcher* happened to contract with an Illinois-based company. Rather, jurisdiction is proper here because of Defendants' *own* actions directed at Illinois. Ultimately, Defendants fail to show how proceeding with this case in Illinois would be incompatible with notions of justice and fair play.

### B. Tortious Interference with a Contract (Count II)

To state a claim under Illinois law for tortious interference with a contract, a plaintiff must demonstrate:

> (1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's wrongful conduct; and (5) damages. Thus, to adjudicate a tortious interference claim, a court must determine if a breach of the relevant contract has actually occurred. Under Illinois law, this determination is one of fact, in which the factfinder must interpret the relevant contract terms and analyze the actions of the party accused of breaching vis-à-vis these contract terms. Therefore, to adjudicate a tortious interference claim under Illinois law, a court must interpret the relevant contract.

*Healy v. Metro. Pier and Exposition Auth.*, 804 F.3d 836, 842 (7th Cir. 2015) (internal citations omitted). One caveat to this law is that "an entity cannot be liable in tort for interfering with its own contract. To be tortious, the interference must come from an entity not a party to the contract." *See Knickman v. Midland Risk Services–Illinois, Inc.*, 298 Ill. App. 3d 1111, 1116 (4th Dist. 1998); *see also Kimbro v. Pepsico, Inc.*, 215 F.3d 723, 726 (7th Cir. 2000). As such, agents working to

11

carry out contract terms entered by their principals have a conditional privilege against tortious interference with contract claims. *See, e.g.*, *Grecian Delight Foods, Inc. V. Great Am. Ins. Co. of N.Y.*, 365 F. Supp. 3d 948, 956 (N.D. Ill. 2019) ("[T]he interference must come from an entity not a party to the contract. . . . This principle extends to agents of one of the contracting parties.") (internal quotation marks and citation omitted).

As a threshold issue, the parties dispute whether Defendants were Fletcher's agents such that this conditional privilege might apply. (Dkt. 10 at 10; Dkt. 28 at 6–8). To begin, Defendants argue that Stonegate fails to state a claim for tortious interference because "both Enstar and Cranmore are Fletcher's agents in administering Fletcher's Reinsurance Agreements, meaning that they are conditionally privileged against a claim that they interfered in the contractual relationship of their principal, Fletcher."[1] (Dkt. 10 at 9; *see also id.* at 10). They assert that the Complaint actually *concedes* that Defendants are Fletcher's agents when it alleges that Defendants agreed to "service Maiden Re's reinsurance treaties, including Stonegate's treaties with [Fletcher]." (*Id.* at 10; *see also* Dkt. 1-2 at 11 ¶ 7). Stonegate counters that "[n]owhere does the Complaint refer to an agency relationship, let alone concede that Defendants were [Fletcher's] agents." (Dkt. 25 at 8). In addition, Stonegate points to certain provisions in the contracts entered between Defendants and Fletcher that could be read to disclaim a principal-agent relationship between those parties. (*Id.* at 9).

---

[1] Defendants supplied the Court with copies of the agreements that Enstar and Cranmore entered into with Fletcher to administer and service Fletcher's reinsurance treaties, including the Reinsurance Agreements. (*See* Dkts. 11-1, 11-2). Documents that "a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Pine Top Receivables of Ill., LLC v. Banco De Seguros del Estado*, No. 12-cv-6357, 2013 WL 677986, at *2 (N.D. Ill. Feb. 25, 2013) (citing *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir.1993)). Here, Stonegate referred to Fletcher's Reinsurance Agreements in its Complaint. (Dkt. 1-2 at 3, 22). Moreover, these agreements form the basis of Stonegate's Complaint; Stonegate's claims against Enstar and Cranmore rest entirely on the manner in which the latter entities serviced the Reinsurance Agreements on Fletcher's behalf. The Court thus may reference these documents in considering Defendants' motion to dismiss.

Here, Defendants were authorized to act on behalf of Fletcher for purposes of servicing Fletcher's Reinsurance Agreements. For example, the Intercompany Services Agreement between Enstar and the company now known as Fletcher states that Enstar "will be responsible for the supervision, adjustment and payment of all claims arising under policies or contracts of insurance and reinsurance entered into by or on behalf of [Fletcher]." (Dkt. 11-1 at 4 (further providing that Enstar will, among other things, "[r]eview, examine, defend, adjust, and pay [claims] on behalf of the Company") (emphasis added)). Cranmore's contract with Fletcher provides that Cranmore will "be retained to conduct insurance and/or reinsurance claims management services, inspection of books and records of various insurance and/or reinsurance programs, arbitration and/or litigation support, and other insurance consultant services." (Dkt. 11-2 at 2 (further providing that Cranmore will provide services "with due care and with skill reasonably expected of experienced professionals performing similar services")). Given Defendants' authority to service Fletcher's reinsurance agreements in this way, they are properly considered Fletcher's agents.

As Fletcher's agents, the Defendants have a conditional privilege against tortious interference with contract claims. *See, e.g.*, *Grecian Delight Foods*, 365 F. Supp. 3d at 956. To overcome the conditional privilege and state a claim for intentional interference with contract, Stonegate bears the burden of pleading that Defendants' "conduct was unjustified or malicious." *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 156 (1989); *see also, e.g.*, *Williams v. Shell Oil Co.*, 18 F.3d 396, 402–03 (7th Cir. 1994). "The term 'malicious,' in the context of interference with contractual relations cases, simply means that the interference must have been intentional and without justification." *HPI*, 131 Ill. 2d at 156–57. In addition, unjustified conduct refers to conduct that "is totally unrelated or even antagonistic to the interest which gave rise to defendant's privilege." *Id.* at 158. For example, an agent "would not

13

be justified in inducing a breach of contract solely for [his] gain, or solely for the purpose of harming the plaintiff, since such conduct would not have been done to further the [principal's] interests." *Id.* at 158–59. *See also, e.g.*, *Creation Supply, Inc. v. Hahn*, No. 19-cv-6033, 2020 WL 4815905, at *7 (N.D. Ill. Aug. 19, 2020) (granting motion to dismiss tortious interference claim where "Plaintiff's allegations do not permit a reasonable inference that Defendants acted solely for their own gain, solely for the purpose of harming Plaintiff, or contrary to [the principal's] interests."); *Gardner Denver, Inc. v. Nat'l Indemnity Co.*, 2015 IL App (4th) 140713–U ¶ 25.

Stonegate purports to rebut Defendants' conditional agency privilege by alleging that that Enstar's "conduct was wholly aimed at benefitting its own financial self-interest, which . . . [is] prejudicial and injurious to, [Fletcher]." (Dkt. 1-2 at 22 ¶ 54). For this, Stonegate relies on *Gardner*, 2015 IL App (4th) 140713-U. There the Court found that a plaintiff stated a claim for tortious interference with a settlement agreement it entered with its original insurer; the defendants were reinsurers that assumed the original insurer's obligations and liabilities. *Id.* ¶ 7. The Court held that the *Gardner* plaintiff overcame defendants' conditional agency privilege by pleading that the original insurer complied with settlement terms for years before the defendant-reinsurers assumed control, and that the defendants were "attempt[ing] to reduce [their] liabilities in order to increase [their] profits." *Id.* ¶ 27.

Recently, however, a Court in this district distinguished *Gardner* where no allegations tended to show that the defendants had a motive – independent of or opposing their principal's – to deny insurance coverage. *Creation Supply*, 2020 WL 4815905, at 7. Because "the conduct Defendants allegedly undertook for personal gain was inextricably intertwined with their efforts to reduce [their principal's] coverage obligations, [it] therefore cannot be said to be 'totally unrelated or . . . antagonistic to' [their principal's] interests." *Id.* at *6 (citing *HPI*, 131 Ill. 2d at

14

158). Therefore, the tortious interference claim was dismissed; the plaintiff failed to plead that the defendants' conduct was malicious or unjustified. The same is true here. Though Stonegate alleges that Defendants acted in their own financial interest, it pleads no facts as to how Defendants' financial interests are "prejudicial or injurious to" Fletcher's in any way. As such, Stonegate's allegations do not permit a reasonable inference that Defendants acted solely for their own gain, contrary to Fletcher's interests, such that the conditional agency privilege should not apply.

Ultimately, as Fletcher's agents, Defendants are conditionally privileged from Stonegate's tortious interference claim. Accordingly, Defendants' motion is granted as to Count II.

### C. Bad Faith Refusal to Pay Claims (Count III)

Section 155 of the Illinois Insurance Code provides as follows:

> In any action by or against a company wherein there is in issue the liability of a company on a **policy or policies of insurance** or the amount of the loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable costs in the action reasonable attorney fees, other costs, plus [a penalty figure].

215 ILCS 5/155 (emphasis added). In sum, Section 155 "provides an extracontractual remedy to policyholders whose insurer's refusal to recognize liability and pay a claim under a policy is vexatious and unreasonable." *Creation Supply*, 2020 WL 4815905, at *3 (citing *Cramer v. Ins. Exch. Agency*, 174 Ill. 2d 513, 519 (1996)). Plaintiff alleges that Fletcher is liable under Section 155 given its refusal to provide coverage for the Clay Claim, among other claims. (Dkt. 1-2 at 24). Further, and as relevant here, Stonegate argues that Defendants' "inducement of [Fletcher's] breach of the Treaties" likewise violates the statute. (*Id.* (adding that "Enstar's conduct has been consistently unreasonable across insurers, and there is no good-faith basis for its "deny, delay, don't pay" business strategy")). Defendants counter that Section 155 does not apply to reinsurers

15

or their agents – rather, it only applies to "the liability of a company on a policy or policies of *insurance*." (Dkt. 10 at 11 (quoting 215 ILCS 5/155 (emphasis added)). Their reasoning is supported by the fact that the term "Policy," as used in Section 155, is defined in the Illinois Insurance Code as "an *insurance* policy or contract" and not a *reinsurance* agreement as defined elsewhere in the law. (*Id.* (citing 215 ILCS 5/2(n)) (emphasis added); *see also* 215 ILCS 5/173 (setting forth *reinsurance* agreement rules)).

As the parties recognize in their briefing, the case law on this point is slim. (Dkt. 25 at 12; Dkt. 28 at 9). Indeed, as one Illinois state Court noted: "[As to the] question[] of whether Section 155 applies to reinsurance agreements . . . it seems to the Court that ultimately the law in Illinois on that issue is in flux, and that there is not a clear precedent that clearly defines the scope of that provision." *Amerisure Mut. Ins. Co. v. Global Reinsurance Corp. of Am.*, 399 Ill. App. 3d 610, 615 (2010) (quoting lower court proceedings). That said, the Supreme Court of Illinois has stated – when considering provisions of the Illinois Insurance Code – that "the terms 'insurance' and 'reinsurance' have distinct and separate meanings." *In re Liquidations of Reserve Insurance Co.*, 122 Ill.2d 555, 563 (1988) (emphasis added). The Court elaborated:

> Reinsurance is not a contract to insure those who face the risk of loss by fire or death or accident [for example] . . . . Instead, an agreement of reinsurance is a promise by one insurance company to reimburse the original insurer should it be compelled to pay under the policy of direct insurance the insured who suffered the original loss. . . . If "reinsurance" were intended to be included within "insurance," then the specific inclusion of "reinsurance" in [other provisions of the law] would be redundant and surplusage. . . . In addition, we note that when the legislature intended reinsurance to be included within a particular section, "reinsurance" was explicitly mentioned. . . . **A contract of reinsurance is not one of insurance but simply one of indemnity, and . . . [such contracts] remain totally distinct and unconnected.**

*Id.* at 562–63 (emphasis added). *See also BCS Ins. Co. v. Guy Carpenter & Co., Inc.*, 490 F.3d 597, 602–03 (7th Cir. 2007) (finding that "insurance" and "reinsurance" have separate and distinct

16

meanings under the Illinois Insurance Producers Limitations Act); *Harleysville Lake States Ins. Co. v. Lancor Equities, Ltd.*, No. 13-cv-6391, 2014 WL 5507572, at *9 (N.D. Ill. Oct. 31, 2014) (explaining same in the context of an Illinois Insurance Code claim).

Given this precedent, it is clear that Section 155 does not permit a bad faith claim to be brought against a *reinsurer's* agents, such as the Defendants. In other words, Stonegate cannot bring a claim against Defendants under Section 155, because Section 155 pertains only to *insurance* contracts – not reinsurance contracts. Accordingly, Count III must be dismissed as to Defendants.

## CONCLUSION

For the foregoing reasons, Defendant Fletcher's and Defendants Enstar and Cranmore's motions to dismiss [9, 13] are granted.

_____
Virginia M. Kendall
United States District Judge

Date: December 6, 2021