# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| STONEGATE INSURANCE COMPANY, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> ENSTAR (US) INC., a Delaware corporation, and ) <br> CRANMORE (US) INC., a Delaware corporation, ) <br> ) <br> Defendants. ) | Hon. Judge Virginia M. Kendall <br><br> Case No. 1:21-cv-03523 |

## AMENDED COMPLAINT

Plaintiff Stonegate Insurance Company ("Stonegate"), by and through its attorneys, as and for its Amended Complaint against Defendants Enstar (US) Inc. and Cranmore (US) Inc. (collectively, and together with their affiliates, "Enstar"), states as follows:

## INTRODUCTION

1. Since acquiring Fletcher Reinsurance Company, f/k/a Maiden Reinsurance North America ("Maiden Re") in late December 2018, Enstar has directed a pattern and practice of improperly refusing to pay valid and timely reinsurance claims in violation of Maiden Re's contractual obligations. Enstar's bad-faith business strategy of "deny, delay, don't pay"—which has been documented in lawsuits around the country, and indeed in Enstar's own SEC filings—has caused significant harm to insurance companies nationwide, has thus far resulted in the wrongful withholding of over $2.1 million to which Stonegate is entitled under its contracts with Maiden Re, and caused additional harm to Stonegate as a result of its direction that Maiden Re deny or delay payment on valid claims. Stonegate seeks damages against Enstar, including punitive damages, for its tortious interference with the reinsurance treaties between Stonegate and Maiden Re.

**PARTIES**

2. Stonegate is an Illinois insurance company with its principal place of business in Niles, Illinois. Stonegate is authorized to issue policies of insurance in the State of Illinois, including, but not limited to, commercial automobile, homeowners, business liability, liquor liability, general liability, and private passenger automobile policies.

3. On information and belief, Defendant Enstar (US) Inc. is a Delaware corporation and its principal place of business is in St. Petersburg, Florida. On information and belief, Enstar (US) Inc. is a wholly-owned subsidiary of Enstar Group Limited, a Bermuda entity ("Enstar Group").

4. On information and belief, Defendant Cranmore (US) Inc. is a Delaware corporation with its principal place of business is in St. Petersburg, Florida. On information and belief, Cranmore (US) Inc. is a wholly-owned subsidiary of Enstar Group.

5. On December 27, 2018, Maiden Re was acquired by Enstar Group through its subsidiary Enstar Holdings (US) LLC, a Delaware corporation with its principal place of business in St. Petersburg, Florida. Around that same time, Enstar acquired various other reinsurer entities (with its website boasting "100+ acquisitions to date") and completed multiple reinsurance portfolio transfers.

6. On information and belief, Enstar (US) Inc. and Cranmore (US) Inc. entered into agreements with Maiden Re to service Maiden Re's reinsurance treaties, including Stonegate's treaties with Maiden Re.

**JURISDICTION AND VENUE**

7. Jurisdiction of this Court is founded upon 28 U.S.C. §§ 1332(a) and 1441. Defendants removed this action from Illinois state court on the grounds that this Court has

jurisdiction over this action because the amount in controversy exceeds $75,000 and because complete diversity exists between the parties. *See* ECF No. 1 (Notice of Removal).

8. This court has personal jurisdiction over Defendants because: (1) Defendants transact business in Illinois; (2) Enstar committed a tortious act in Illinois by interfering with contracts between Maiden Re and Stonegate, an Illinois insurance company; (3) on information and belief, when Enstar acquired Maiden Re it acquired certain rights and obligations under the contracts between Maiden Re and Stonegate; and (4) on information and belief, Enstar agreed to service Stonegate's treaties with Maiden Re. Therefore, Defendants have sufficient minimum contacts with Illinois to subject Defendants to the jurisdiction of this Court and to service of process pursuant to 735 ILCS 5/2-209(a)(1), (2), (7), and (10) and the Due Process Clause of the United States Constitution.[1]

9. Venue is proper pursuant to 28 U.S.C. § 1441(a). Defendants removed this action from Illinois state court to this District and Division because they are "the district and division embracing the place where [the state court] action [was] pending[.]" *See* ECF No. 1 (Notice of Removal).

10. Venue is further proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Stonegate's claim occurred in this District and Division, where Stonegate is headquartered.

---

[1] In their motion to dismiss Stonegate's original Complaint, Defendants argued that this Court lacks personal jurisdiction over them. This Court rejected that argument in its December 6, 2021 Memorandum Opinion and Order. ECF No. 37 at 7–11.

3

**FACTUAL ALLEGATIONS**

**I.      Overview of the Stonegate/Maiden Re Relationship**

11.     Since Stonegate's inception over a decade ago, Maiden Re and Stonegate enjoyed a mutually beneficial business partnership whereby Maiden Re reinsured Stonegate's automobile and commercial insurance lines pursuant to successive Multiple Line Excess of Loss and Quota Share reinsurance treaties, conducted quarterly visits to Stonegate's offices, and performed annual audits of Stonegate's claims and operations processes. Under those reinsurance treaties, Maiden Re assumed a certain percentage of Stonegate's claims exposure in exchange for premium payments. True and correct copies of the reinsurance contracts between Maiden Re and Stonegate relevant to the instant dispute, which provided coverage for the years 2012 through 2017 (collectively, the "Treaties"), are attached to Stonegate's original Complaint as Exhibits A, B, C, D, E, and F. ECF No. 1-2 at 27–120.

12.     Article 7.D[2] of each of the Treaties provides that Maiden Re must pay Stonegate "its portion of Ultimate Net Loss and Loss Adjustment Expenses paid by [Stonegate] within 15 days after satisfactory proof of payment is received."

13.     From 2011 until Enstar's acquisition of Maiden Re in late December 2018, Stonegate and Maiden Re operated harmoniously under a mutual understanding of the risk-sharing obligations imposed by the Treaties. For several years, Maiden Re assiduously fulfilled its obligations under the Treaties by timely paying claims without objection or reservation of rights, never denying coverage for a claim, and declining to assert its rights of association in the defense of claims—thereby providing the ultimate consumers (Illinois policyholders) with appropriate security and protection of their bargained-for insurance coverage. At times, Maiden Re even took

---

[2] The 2012 Treaty contains an identical payment provision in Article 14.D.3.

positions vis-à-vis the Illinois Department of Insurance that were favorable to and aligned with Stonegate to assist with reinsurance approvals.

14. However, the relationship between Maiden Re and Stonegate markedly changed after Enstar acquired Maiden Re in late 2018 and began servicing the Treaties. In contrast to the collaborative, good-faith relationship the parties had enjoyed to that point, the relationship turned adversarial, and at times combative, as delayed payments by Maiden Re became the norm, Defendants fabricated coverage disputes, and made unreasonable demands for claim-related information. For example, prior to Enstar's acquisition of Maiden Re, Maiden Re typically issued payment to Stonegate within fourteen days after receiving an invoice from Stonegate. Since Enstar acquired Maiden Re, Maiden Re has taken, on average, over three months to issue payment to Stonegate after receiving an invoice, and several invoices presently remain outstanding and unpaid.

15. Enstar and Maiden Re are withholding payments to Stonegate with such frequency and duration in an attempt to place Stonegate in a position to negotiate, and ultimately compromise, its valid claims in bulk at a discount. Indeed, Enstar's practice of acquiring insurance companies, then directing the acquired insurers to contest and litigate valid claims so as to decrease the insurers' ultimate liability, is central to its self-described business model. Enstar's 10-K filing with the Securities and Exchange Commission for the quarter ending December 31, 2018 states: "We employ an **opportunistic commutation strategy** in which we **negotiate** with policyholders and claimants with the goal of commuting or settling existing insurance and reinsurance liabilities **at a discount to the ultimate liability** …" (emphasis added).

16. On information and belief, Anthony D'Angelis, US Head of Assumed Claims for Enstar Group and formerly Senior Vice President of Cranmore (US), Inc., has on Enstar's behalf

5

interfered with Maiden Re's and Stonegate's Treaties by directing Maiden Re to deny and delay payment on valid claims in accordance with Enstar's bad-faith business model, thus causing Maiden Re to breach its obligations to Stonegate under the Treaties.

## II. The Relevant Claims

### A. The Unpaid Clay Claim

17. Stonegate insured Chicago Automotive Group under a commercial automobile policy of insurance with liability limits of $1 million.

18. On November 24, 2014, an employee of Chicago Automotive Group, Horise Horton, was involved in a motor vehicle accident with Nicholas Clay and others in which Clay claims he sustained injuries. Neither Clay's original lawsuit filed over eighteen months later on May 31, 2016, nor a separate lawsuit filed by another involved party in 2015 (later consolidated with Clay's original suit), named Chicago Automotive Group as a party. Chicago Automotive Group was first named as a party when Clay amended his complaint in February 2017, of which Stonegate received notice on May 4, 2017 and assigned it Claim No. 14SGILT0000232 (the "Clay Claim").

19. Stonegate first provided notice of the Clay Claim to Maiden Re on July 10, 2017. On that date, Stonegate tendered to Maiden Re a spreadsheet identifying every open claim by claimant name and corresponding reserves. That spreadsheet specifically identified the Clay Claim (of which Stonegate was first notified approximately two months earlier, on May 4, 2017), and listed the Clay Claim on four separate lines of the spreadsheet representing four different lines of coverage and reserves for that claim.

20. Additionally, during the course of Maiden Re's comprehensive 2017 "Claims and Underwriting audit" of Stonegate spanning two months (July and August 2017), Stonegate supplied Maiden Re with continual, open on-site and remote access to all reinsured claims,

6

accounting, and policy information and documentation, including the Clay Claim. Maiden Re's auditors had ample opportunity to examine and review the Clay Claim and lawsuit in 2017.

21. On May 14, 2018, over one year after filing suit, Clay made a demand to settle his lawsuit for $1 million (equal to the coverage limit of the policy Stonegate issued to Chicago Automotive Group), which Stonegate rejected. Weeks later, on June 5, 2018, Clay voluntarily dismissed his original lawsuit.

22. Clay subsequently re-filed his lawsuit on April 16, 2019, of which Stonegate did not receive notice until August 5, 2019 after service on Chicago Automotive Group. Defense counsel filed an appearance for Stonegate's insured in the re-filed suit on September 19, 2019.

23. On November 20, 2019, Clay disclosed his damages expert, who was deposed on February 17, 2020. That same day, Clay made another policy-limit settlement demand to defense counsel, which was communicated to Stonegate.

24. Upon learning of Clay's second settlement demand and the additional developments in the re-filed Clay lawsuit, including Clay's economic expert's deposition, Stonegate had an opportunity to further evaluate the claim and assess potential damages, and thereafter increased its reserves for the Clay Claim to $100,000 on March 20, 2020.

25. Prior to March 2020, based on a no-fault liability assessment, Stonegate's loss reserve for the Clay Claim was below the threshold level of reserves which would have triggered a separate notice obligation to Maiden Re under the 2014 Treaty. However, the nature, extent and magnitude of Clay's claimed losses evolved over a two-year period throughout the course of the original, dismissed suit and the re-filed suit—as did Clay's theory of liability against Stonegate's insured driver. Such development in claimed losses is not uncommon, as plaintiffs' attorneys

obtain information in discovery that allows them to strengthen their claims and shift their focus towards the defendants with the deepest pockets (*i.e.*, insurance policies).

26. After learning of Clay's newly claimed losses and the shifting focus of litigation towards Stonegate's insured, Stonegate reported Clay's second settlement demand to Maiden Re on March 24, 2020, 26 days after the demand was made to defense counsel.

27. In response to Stonegate's March 24, 2020 communication regarding the Clay Claim, D'Angelis (by email dated March 29, 2020) raised a late-notice coverage defense under Article 13 of the 2014 Treaty. D'Angelis stated that "[w]hile [Maiden Re] has no reinsurance exposure for this claim, [Maiden Re] nonetheless expects that Stonegate will handle and adjust the claim in a diligent and business-like manner as if no reinsurance exists."

28. In March 2020, Stonegate provided a variety of additional information to Maiden Re regarding the Clay Claim. However, Maiden Re has disclaimed reinsurance coverage for the claim, despite Stonegate's repeated requests for payment from Maiden Re for its share of loss payments and expenses on the claim.

29. On May 4, 2020, Stonegate settled the Clay Claim for $1 million, equal to the applicable policy limits. Accordingly, on May 21, 2020, Stonegate made a demand for payment from Maiden Re for its net loss and adjusted loss expenses on the Clay Claim, equal to $915,425.03 under the 2014 Treaty.

30. Maiden Re has not made its required payment to Stonegate for the Clay Claim. Instead, it has wrongfully denied reinsurance coverage for the Clay Claim based on the ill-founded position that Article 13 of the 2014 Treaty obligated Stonegate to provide notice of the Clay Claim either: (1) on the date that the accident occurred in November 2014, (2) when Clay made his May 14, 2018 settlement demand before voluntarily dismissing his original lawsuit, or (3) on a list of

claims requested by Maiden Re prior to its August 2019 audit; and that any notice Stonegate gave to Maiden Re on July 10, 2017 when it provided its spreadsheet of open claims was insufficient.

31. Article 13 of the 2014 Treaty ("Notice of Loss and Loss Settlements") states, in relevant part:

> A. The Company shall advise the Reinsurer promptly of all losses **which may result in a claim hereunder** and of all subsequent developments thereto which may materially affect the position of the Reinsurer.
>
> B. In addition, the Company shall promptly advise the Reinsurer of all bodily injury claims or losses involving any of the following:
>
>> 1. Any claim or loss reserved at 50% or more of the Company's Retention under this Contract.
>
> C. The Company shall have the obligation to investigate and to the extent that may be required by the Policies, defend any claim affecting this Contract and to pursue such claim to final determination. When so requested by the Reinsurer, the Company shall afford the Reinsurer or its representatives an opportunity to be associated with the Company, at the expense of the Reinsurer, in the defense of any claim, suit or proceeding involving or [that] is likely to involve the reinsurance provided under this Contract, and the Company and the Reinsurer shall cooperate in every respect under the defense of such claim, suit or proceeding.

32. Article 13 of the 2014 Treaty did not require Stonegate to give notice of the Clay Claim when the underlying automobile accident took place. Nor was Stonegate required under Article 13 of the 2014 Treaty to give notice to Maiden Re of Clay's May 14, 2018 settlement demand on the date that it was made. Article 13 of the 2014 Treaty also did not require Stonegate to report the Clay Claim in response to Maiden Re's August 2019 audit request. Rather, Stonegate was required, in its discretion, to give notice to Maiden Re only of losses "which *may* result in a claim *hereunder*"—and therefore was required to give notice to Maiden Re of the Clay Claim if and only if Stonegate reasonably believed that the Clay Claim might result in a claim upon Maiden Re.

33. The litigation history underlying the Clay Claim demonstrates that Clay himself did not believe he had a strong case: although the accident occurred in 2014, Stonegate's insured was not named in the lawsuit until February 2017, and Stonegate did not receive notice of the suit until May 2017—almost a year after Clay's lawsuit was filed, and two-and-a-half years after the accident occurred. At the time Stonegate received the May 2018 settlement demand, only fact discovery had been completed and both liability and damages were strongly disputed. Indeed, two weeks after Stonegate denied Clay's settlement demand, Clay voluntarily dismissed his lawsuit, thereby substantiating Stonegate's belief that the Clay Claim was not likely to result in liability under its own policy—let alone a reinsurance claim under the Maiden Re treaty.

34. Moreover, at the time Maiden Re made its request in mid-July 2019 for a list of claims prior to its August 2019 audit, Clay had already voluntarily dismissed his lawsuit. From August 26-28, 2019, Defendants conducted an on-site audit of Stonegate's financials and claims files, followed by remote access to Stonegate's claims and underwriting systems the week of September 16, 2019. Information concerning the status of the Clay Claim was readily available in Stonegate's databases, accessible by Defendants both on-site and remotely. Indeed, D'Angelis (then the Senior Vice President of Cranmore (US), Inc.), sent an email dated August 28, 2019 to Stonegate attaching a spreadsheet outlining "various claim questions and document requests arising out of" the August 2019 audit, which asked for detailed information relating to several open and closed claims but did not include any questions regarding the Clay Claim. At no point was Enstar deprived of an opportunity to review any information related to the Clay Claim or to audit that claim.

35. In all events, Maiden Re had notice of the Clay Claim on July 10, 2017. Maiden Re's position that Stonegate's "bulk-reporting" of the Clay Claim together with other then-open

claims violates the notice requirements of Article 13 of the 2014 Treaty contravenes Illinois law and is unsupported by the plain language of the Treaty, which does not require notice to Maiden Re to be made in any particular form. Indeed, the 2017 register of open claims was provided to Maiden Re in compliance with Maiden Re's request in early July 2017 that Stonegate provide it with "a run of all open claims regardless of reserves at [its] earliest convenience," after deciding that an earlier claims report Stonegate had provided consistent with protocols established in Maiden Re's prior audits, which reflected only Stonegate's incurred claims in excess of $50,000, was inadequate. For Maiden Re to request such a comprehensive list, then later complain that the list was too large for it to identify the most significant claims (such as the Clay Claim), is plainly disingenuous.

36. Accordingly, Stonegate's notice to Maiden Re (first on July 10, 2017, and thereafter on March 24, 2020) was reasonable under the facts and circumstances of the Clay Claim, particularly when viewed in the reinsurance context. Stonegate thus complied with Paragraph (A) of the notice requirements set forth in Article 13 of the 2014 Treaty.

37. Moreover, Paragraph (B) of the notice provision was not triggered until March 20, 2020, when Stonegate increased its reserves for the Clay Claim.

38. Accordingly, Maiden Re had sufficient notice of the Clay Claim, and its unfounded coverage position and denial of reinsurance for that claim is unwarranted, wrongful, and in violation of the 2014 Treaty.

### III. Maiden Re's Pattern and Practice of Bad Faith and Unreasonable Failures to Pay Claims Directed by Enstar

39. On information and belief, Enstar has directed Maiden Re to engage in a pattern and practice of bad faith and unreasonable delay and/or failure to pay valid reinsurance claims (consistent with Enstar's self-proclaimed business model), as illustrated by Maiden Re's repeated

11

(and for some claims, continuing) breaches of the Treaties by (1) fabricating coverage positions unsupported by the Treaties and Illinois law and refusing payment on the Clay Claim, (2) wrongfully delaying payment on other claims on the pretense of "insufficient information" regarding those claims, and (3) failing to respond at all to Stonegate's reimbursement requests on certain other claims until after Stonegate was forced to bring litigation.

40. One example of Maiden Re's unreasonable delay directed by Enstar in paying valid reinsurance claims arose in connection with a claim involving Stonegate's insured party Mobile Transport LLC (Claim No. 16SGILT0000232, the "Mobile Transport Claim"). On April 13, 2021, Stonegate submitted an invoice to Maiden Re seeking payment for the Mobile Transport Claim in the amount of $889,466.71 (reflecting $875,000 in covered loss and $14,466.71 in covered expenses). Although the Treaties require that Maiden Re must pay Stonegate "its portion of Ultimate Net Loss and Loss Adjustment Expenses paid by [Stonegate] within 15 days after satisfactory proof of payment is received," Maiden Re did not make any payment during the required time period, nor did Maiden Re raise any defenses to coverage for the claim. Instead, only after Stonegate was forced to file suit in Illinois state court in May 2021 as a result of Maiden Re's and Defendants' misconduct did Maiden Re attempt to make a payment for the Mobile Transport Claim.

41. However, rather than paying the $889,466.71 due on the Mobile Transport Claim, Maiden Re in June 2021 attempted to pay only $112,677.79. According to a July 22, 2021 email from D'Angelis of Enstar, the attempted payment amount reflected a purported offset of the amount due on the Mobile Transport Claim against certain premium adjustment amounts due from Stonegate to Maiden Re. Such offset was improper, because even without the unpaid Mobile Transport Claim, the amounts owed from Maiden Re to Stonegate for other wrongfully unpaid

12

claims (including the Clay Claim) exceeded the amount of premium adjustments due from Stonegate to Maiden Re (which Stonegate was offsetting against those other unpaid claims pursuant to its contractual rights). Accordingly, Stonegate rejected the improper "net" payment, after which Maiden Re paid the Mobile Transport Claim in full (months after it was due) without any purported offset.

42. Maiden Re and Enstar never provided any explanation for Maiden Re's failure to timely respond to or pay the Mobile Transport Claim until after Stonegate was forced to bring litigation against Maiden Re and Enstar, and they never contested that it was a valid reinsurance claim covered by the Treaties.

43. Another example of bad faith conduct directed by Enstar arose in connection with Maiden Re's failure to pay a claim concerning Stonegate's insured party Q West Inc. with Claim No. 15SGILG0000001 (the "Q West Claim"). An invoice for the Q West Claim was issued to Maiden Re on July 8, 2021 indicating a total amount due of $971,870.02. In an August 30, 2021 letter to counsel for Maiden Re and Enstar concerning the issues to be resolved in a pending arbitration between Maiden Re and Stonegate, counsel for Stonegate stated that in addition to seeking relief for Maiden Re's failure to pay the Clay Claim, Stonegate will seek relief for Maiden Re's failure to pay the Q West Claim.

44. In a September 24, 2021 letter, Defendants' counsel stated that "[Maiden Re] disputes that the Q West Inc. claim is unpaid and part of this arbitration; this claim was only billed in July of 2021 and has been authorized for payment in full by [Maiden Re] and will be released in the coming weeks."

45. However, Stonegate received no payment for the Q West Claim in the subsequent weeks and months, and despite repeated requests by Stonegate during that time (both through

counsel and through the parties' reinsurance broker, Acrisure, LLC ("Acrisure")), Defendants failed to provide any substantive justification for Maiden Re's failure to provide payment.

46. On December 29, 2021, Stonegate (through counsel) again requested that Maiden Re commit to pay the Q West Claim by a date certain. In response, Defendants' counsel stated for the first time that Enstar was instructed by Acrisure on December 1, 2021 to "hold off on payment [of the Q West Claim] pending a forthcoming premium adjustment." Defendants' counsel did not provide any explanation for why that instruction (of which Stonegate had no prior knowledge) would justify Maiden Re's withholding of the Q West Claim payment that months earlier it had stated was "authorized for payment in full by [Maiden Re] and will be released in the coming weeks." Stonegate, though, soon learned the reason: despite Defendants' September 24, 2021 promise that payment of the Q West Claim *in full* had been authorized and would be released imminently, the payment that Defendants actually directed Maiden Re to make after months of improper delay and silence was only a "net" payment for the Q West Claim, deducting premium adjustment amounts purportedly owed by Stonegate. Acrisure stated that it had, without Stonegate's knowledge "advised [Maiden Re] to hold off on sending another net settlement as they were going to deduct from the same premium rate adjustment calculations…. Maiden's adjustment calculations did not reconcile to Acrisure Re's analysis, nor had Stonegate approved Acrisure Re's calculations or provided their own analysis."

47. At no time did Stonegate indicate to Acrisure, Maiden Re, or Defendants that a net payment would be acceptable, rather than payment "in full" as promised in September 2021, and Stonegate promptly informed Acrisure that Stonegate did not agree that a net payment on the Q West claim was proper. Defendants were well aware of Stonegate's position regarding the impropriety of a net payment given the other wrongfully unpaid claims owed from Maiden Re to

14

Stonegate: in connection with the Mobile Transport Claim, Stonegate rejected such a "net" payment, after which Maiden Re paid that claim in full without any purported offset.

48. Since the initial invoice to Maiden Re for the Q West Claim, Stonegate has submitted additional invoices to Maiden Re for the Q West Claim representing additional legal expenses incurred by Stonegate (and covered by the parties' reinsurance treaties) in connection with the claim. As a result of the additional legal expenses to date, the total covered expenses for the Q West Claim are $331,650.16. Taken together with the total covered indemnity amount of $916,144, the total amount Maiden Re owes Stonegate on the claim equals $1,247,794.16.

### FIRST CAUSE OF ACTION
### Tortious Interference With Contract

49. Stonegate realleges Paragraphs 1-48 as though fully set forth herein.

50. The Treaties constitute valid and enforceable reinsurance contracts between Stonegate and Maiden Re.

51. By virtue of the fact that Enstar (US) Inc. and Cranmore (US) Inc. entered into agreements with Maiden Re to service Stonegate's reinsurance treaties with Maiden Re, and in view of Enstar's acquisition of Maiden Re, Enstar had knowledge of the existence and terms of the Treaties.

52. Through its conduct, Enstar intentionally, maliciously, and unjustifiably induced Maiden Re to breach the Treaties.

53. Enstar's direction of Maiden Re's breaches of its reinsurance contracts was malicious in an effort to harm Stonegate's business. For example, Maiden Re remitted payment to Stonegate for the Mobile Transport Claim months after that claim was submitted to Maiden Re for payment, in blatant violation of the clear timing requirements for Maiden Re's payments under the Treaties. Maiden Re never raised any questions, concerns, or defenses regarding the validity

of the Mobile Transport Claim or Maiden Re's obligation to pay it. Nevertheless, it was not until after Stonegate was forced to file suit against Maiden Re and Enstar regarding wrongfully unpaid claims that Maiden Re, via the Enstar entities that service the Treaties, first attempted to make good on its obligations to pay the Mobile Transport Claim. On information and belief, Enstar directed Maiden Re to withhold timely payment of the Mobile Transport Claim, in a malicious attempt to force Stonegate to either sacrifice its right to payment of that valid claim or incur substantial costs in bringing Maiden Re and Enstar to court to seek relief for the wrongful withholding of claims payments.

54. As another example, Defendants' counsel admitted to Stonegate in a September 24, 2021 letter that the uncontested Q West Claim—which by that time was long overdue for payment by Maiden Re—"has been authorized for payment in full by [Maiden Re] and will be released in the coming weeks." However, more than two months passed after that admission without any payment of the uncontested Q West Claim or any explanation for the delay, and when Maiden Re finally attempted a payment on the Q West Claim in December 2021, it attempted to make only a net payment that was improper given the parties' active disputes regarding other amounts owed. Upon information and belief, Enstar directed Maiden Re's unjustified delay in payment after the admission that it had been approved in full, in breach of the reinsurance treaties, and directed the attempted improper net payment of the Q West Claim (which was communicated to Acrisure by D'Angelis of Enstar).

55. Upon information and belief, Enstar did so with the knowledge and malicious intent that Maiden Re's improper failure to pay the uncontested Q West Claim in full by the end of 2021 would require Stonegate to report that claim as unpaid in regulatory filings, causing further harm to Stonegate. State licensing requirements for excess and surplus insurance carriers mandate that

Stonegate maintain a certain level of surplus funds. In connection with annual reporting and regulatory review of insurers' financial condition, state insurance regulators treat overdue balances recoverable from reinsurers as reducing the insurer's amount of surplus. As a direct result of Maiden Re's non-payment of the Q West Claim, Stonegate's financial condition was harmed, and Stonegate's parent company was forced to secure additional debt financing in order to make a substantial capital infusion in Stonegate that would allow Stonegate to satisfy surplus requirements at the end of 2021.

56. Moreover, Enstar's conduct was injurious to the interests of Maiden Re. Upon information and belief, Maiden Re has incurred substantial costs, including but not limited to legal costs and attorney's fees, as a result of Enstar's pattern and practice of directing Maiden Re to breach its reinsurance treaties with its insureds (including Stonegate). Where Enstar's direction of contractual breaches causes reinsurers like Maiden Re to incur substantial legal costs arising from their denial of or failure to pay valid claims, Enstar's independent interest in reducing coverage obligations for its reinsurance portfolio in the aggregate is antagonistic and injurious to the interests of the individual reinsurers who, like Maiden Re, are called to account for the breaches directed by Enstar in legal proceedings to which Enstar is not a party. Upon information and belief, Enstar's practice of directing Maiden Re and other acquired reinsurers to contest and litigate valid claims is additionally harmful to Maiden Re's interests by damaging Maiden Re's longstanding business relationships with its cedent companies.

57. Maiden Re's breach of the Treaties was caused by Enstar's actions.

58. As a direct and proximate cause of Enstar's conduct, Stonegate has sustained damages in an amount to be determined at trial.

59. As Enstar's conduct was committed with actual malice or with such gross negligence as to indicate a wanton disregard of Stonegate's rights, the imposition of punitive damages is warranted.

**PRAYER FOR RELIEF**

WHEREFORE, for the above and foregoing reasons, Stonegate respectfully requests that the Court:

1. enter judgment in favor of Stonegate and against Enstar (US) Inc. and Cranmore (US) Inc. for compensatory damages sustained as a result of Defendants' actions, in an amount in excess of $2.1 million;

2. enter judgment in favor of Stonegate and against Enstar (US) Inc. and Cranmore (US) Inc. for punitive damages of at least $1 million; and

3. grant Stonegate such other and further relief as this Court deems just and proper under the circumstances.

Dated: May 19, 2022

Respectfully submitted,

/s/ Sean P. Baldwin
Sean P. Baldwin (*pro hac vice*)
David A. Coon (*pro hac vice*)
SELENDY GAY ELSBERG PLLC
1290 Avenue of the Americas
New York, NY 10104
(212) 390-9000
sbaldwin@selendygay.com
dcoon@selendygay.com

Howard L. Teplinsky
Katherine A. Grosh
LEVIN GINSBURG
180 North LaSalle Street, Suite 3200
Chicago, Illinois 60601
(312) 368-0100
hteplinsky@lgattorneys.com
kgrosh@lgattorneys.com

*Attorneys for Plaintiff Stonegate Insurance Company*